F. A. ONTJES, Appellee, v. W. G. C. BAGLEY et al., Appellants.

No. 41953.

SEPTEMBER 19, 1933.

Davis, McLaughlin & Hise, and Smith & Feeney, for appellants.

F. A. Ontjes, for appellee.

Kintzinger, J.—The Northwestern States Portland Cement Company was organized as a corporation under the laws of West Virginia in 1906 with an original capital stock of $3,500,000, which was subsequently increased to $5,250,000, divided into 52,500 shares of common stock with a par value of $100 each. All of the shares are outstanding. Plaintiff is the owner and holder of 100 shares of the common stock.

As indicated by its title, the business of the corporation was the manufacture and sale of cement and its allied products. The corporation was a successful and going concern.

In June, 1930, a reorganization plan, providing for the creation of an Iowa corporation, was adopted by the board of directors and consented to by over 99½ per cent of all of the capital stock of the corporation. The new corporation was organized under the laws of the state of Iowa, with the same name as the old.

Under the reorganization plan, all of the assets and property of the West Virginia corporation were to be sold, assigned, and transferred to the new Iowa corporation, in consideration of which the Iowa corporation was to assume all of the liabilities of the West Virginia corporation, and was to issue four shares of its common stock for each share of common stock held by the stockholders of

the West Virginia corporation, the new stock to be deposited in a depository where the exchange of stock would be made.

The reorganization plan also provided for the payment of $100 per share to all non-assenting stockholders. The plan also contemplated the dissolution of the West Virginia corporation. The Iowa corporation was organized under the laws of Iowa, and more than 99 per cent of the stockholders in the West Virginia corporation deposited their stock in accordance with the reorganization plan. Less than one-half of one per cent failed to join in the reorganization plan. There were 52,500 shares outstanding in the old corporation, and the holders of over 52,000 shares assented to the reorganization. Plaintiff holds 100 shares of stock, and he refuses to join. The total stock not joining in the plan represented about 210 shares.

At and long prior to the time of the proposed reorganization, the statutes of West Virginia authorized corporations of that state to sell, assign, and transfer all of its assets on the affirmative vote of 60 per cent of its outstanding stock.

The statutes of West Virginia, where the corporation was organized, provide as follows:

"Sec. 83. On the affirmative vote, in person or by proxy, of the holders of at least sixty per centum of the outstanding stock of the corporation, such corporation may sell, transfer or assign in good faith, all of its property and assets; but a smaller majority shall not have the right to make such a sale, transfer or assignment." (W. Va. Code, [1913] 54:83; amended 1901, ch. 35.)

They also provide:

"Sec. 56. The stockholders may at any time in general meeting resolve to discontinue the business of the corporation, the majority of the capital stock being represented and voting in favor of such discontinuance; and may divide the property and assets that may remain after paying all debts and liabilities of the corporation." (Section 56, ch. 53, Code.)

Appellee alleges that the West Virginia corporation has a valid claim of over $2,000,000 against the estate of its former president, C. H. MacNider; that the action of the corporation was controlled by the former president and his relatives, one of whom is now president of that corporation. Appellee also claims that the reorganization plan contemplates the transfer of all the assets of the corpora-

tion to the new corporation without reference to said claim, and with no intention to collect the same.

He also contends that the corporation has no power to arbitrarily fix the price of his stock and that of other nonassenting stockholders, regardless of the actual value of this stock. Plaintiff alleges that the reorganization scheme would work an irreparable injury upon him. It is shown that, if the claim he urges for the corporation is fully established, the value of his interest in the corporation would be increased about $100 per share.

I. It is claimed that the plan or scheme of reorganization was an undertaking to convey all of the West Virginia company's assets and property to the Iowa corporation, and that it had no power to do so as against plaintiff's objection.

It is well settled that the laws of the state in which a corporation is organized constitute a part of its corporation charter, and, both taken together, form the contract between the corporation and its stockholders.

The provisions of the statute or general incorporation laws of the state in which a corporation is organized enter into and form a part of the charter. It is the rule that, in construing a corporate charter, the incorporation papers and statutes of the state of incorporation are to be construed together. The statutes need not be copied into the charter, but they form an essential part of it, and all parties are bound thereby, whether contained in the charter or only in the statutes. Statutory or constitutional provisions automatically become a part of the charter. Fletcher on Corporations, vol. 1, sec. 164; 1 Morawetz on Private Corp. 318; Traer v. Lucas Prospecting Co., 124 Iowa 107, 99 N. W. 290; Peters v. U. S. Mortgage Co., 13 Del. Ch. 11, 114 A. 598; Detroit Mortgage Corp. v. Vaughan, 211 Mich. 320, 178 N. W. 697, 182 N. W. 526; Weede v. Emma Copper Co., 58 Utah 524, 200 P. 517; Germer v. Triple-State Natural Gas & Oil Co., 60 W. Va. 143, 54 S. E. 509.

The articles of incorporation of the West Virginia corporation themselves contain no specific reference to its authority to sell, assign, and transfer its property. This authority, however, is contained in the statutes hereinabove referred to, and these statutes authorizing such transfer automatically become a part of its charter. Therefore the charter, when read in the light of the statutes, fully authorizes the West Virginia corporation to make such transfer. Such is the law of West Virginia and Iowa. Germer v. Triple-State

Natural Gas & Oil Co., supra; Traer v. Lucas Prospecting Co., supra.

In Germer v. Triple-State Natural Gas & Oil Co., supra, the Supreme Court of West Virginia said:

"Did the stockholders have the right, under the laws of West Virginia, to vote and sell all the property of the corporation, and take in payment the stock and bonds of another corporation? It is conceded that, prior to the act of 1901, no such power existed under our statute in the stockholders to so dispose of their property, but it is claimed that under section 83, added to chapter 54 of the Code of 1899 by chapter 35, p. 93, Acts 1901, full power was granted to so sell and dispose of the property of the corporation by the holders of at least 60 per centum of the outstanding stock of the corporation and to transfer the same, taking in payment therefor the stock of another corporation. It will be seen that the said section 83 provides that holders of 60 per centum of the outstanding stock of the corporation may sell, transfer, or assign in good faith all of its property and assets, and, while it does not expressly and in terms authorize the corporation to take in payment therefor the stock or bonds of another corporation, yet, with the full power to sell, transfer, or assign in good faith all of its property and assets under the said new section 83, it would seem clear that under the provisions of section 3, c. 52, of the Code of 1899, as amended by said chapter 35, p. 93, of the Acts of 1901, the corporation has full power to subscribe for or purchase the stock, bonds, or securities of any joint stock company. This it can do, upon a majority vote of the stock, by plain implication. Having the right to sell, transfer, and assign all its property under section 83, and, under said section 3, c. 52, as amended, having the right to subscribe for, or purchase the stock, bonds, or other securities of any joint-stock company, it would follow as a necessary sequence that it could take the one in payment for the other."

In Traer v. Lucas Prospecting Co., 124 Iowa 107, loc. cit. 112, 99 N. W. 290, we said:

"The charter of a corporation formed under a general law consists of its articles of incorporation, taken in connection with the law under which the organization takes place. The provisions of the law enter into and form a part of its charter, and the charter,

thus construed, contains the 'terms of the agreement of the association between the shareholders, and indicates the character and extent of the business in which the company shall engage.' * * * When a person becomes a shareholder in a corporation, he assents to the transaction of the business expressly or impliedly authorized by its charter; and therefore, if the charter authorizes the sale or other disposition of all of its property, he cannot complain. It is a well-settled rule that a strictly private corporation has the same right to dispose of its property that an individual has, and that, when insolvent or in a failing condition, it may sell all thereof without the consent of all of the shareholders, and this much is conceded by the appellant. * * * It is said by the appellees that because section 1609, par. 6, of the general incorporation law of the state, gives a corporation the power 'to make contracts, acquire and transfer property, possessing the same power in such respects as natural persons,' it has 'implied power to dispose of any or all of its property whenever this is deemed expedient in carrying out the purposes for which it was organized.'" In that case we further said: "The question of the insolvency or failing condition of the Lucas Prospecting Company must be eliminated from the case, because of its answer denying such condition, and because the evidence wholly fails to prove it; and we go to the charter of the company, to determine whether it is therein given the power to sell and transfer all of its property."

II. It is well settled both under the laws of Iowa and West Virginia that stockholders representing more than 60 per cent of the capital stock in a private corporation can sell and dispose of all of their property. It is also well settled under the laws of both states that under the articles of incorporation of the West Virginia company the entire property and assets of the corporation may be sold to another corporation in exchange for the capital stock therein. "A charter which confers power to dispose of all corporate property and also empowers the corporation to deal in stocks of other corporations, may sell all of its property for stock in another corporation, even though the transaction amounts to a consolidation." Traer v. Lucas Prospecting Co., 124 Iowa 107, 99 N. W. 290.

Plaintiff also contends that it would be a fraud upon him to permit the corporation to waive the claim which he alleges the corporation has against the estate of its former president. These are

matters which will have to be determined when the case is tried upon its merits. We do not consider it necessary to determine them on this appeal.

III. It is urged that, upon the showing made, the lower court had a discretionary right to allow a temporary injunction restraining defendants from carrying out the reorganization plan until after the matters in issue are determined upon their merits. It is the rule in all cases that, where a temporary injunction is applied for, the court necessarily has a certain amount of discretion, which, if properly exercised, should not be disturbed on appeal. 14 R. C. L. 313, sec. 12; Hall v. Henninger, 145 Iowa 230, 121 N. W. 6, 139 Am. St. Rep. 412; Doige v. Bruce, 141 Iowa 210, 119 N. W. 624; M. & St. L. Ry. Co. v. C., M. & St. P. Ry. Co., 116 Iowa 681, 88 N. W. 1082.

Under ordinary conditions, we would not be inclined to disturb the ruling of the lower court ordering a temporary injunction. In this case, however, we believe the interests of the plaintiff can be fully protected without the necessity of a temporary injunction. Under the "Balance of Convenience Rule" recognized in this state, a temporary injunction is not compulsory where plaintiff's rights can be amply protected in some other manner. Beidenkopf v. Ins. Co., 160 Iowa 629, 142 N. W. 434, 46 L. R. A. (N. S.) 290; Bonaparte v. R. R. Co., Baldw. 205, Fed. Cas. No. 1,617; Becker v. R. R. Co., 188 Pa. 484, 41 A. 612; Fisk v. Hartford, 70 Conn. 720, 40 A. 906, 66 Am. St. Rep. 147; City of Ft. Dodge v. Ft. Dodge Telephone Co., 172 Iowa 638, 154 N. W. 914; I High on Injunctions (4th Ed.) sec. 7; 14 R. C. L. 358; Cleveland v. Martin, 218 Ill 73, 75 N. E. 772, 3 L. R. A. (N. S.) 629; Rossing v. State Bank, 181 Iowa 1013, 165 N. W. 254; Finch v. Warrior Cement Corp., 16 Del. Ch. 44, 141 A. 54, 60; Tanner v. Lindell Ry. Co., 180 Mo. 1, 79 S. W. 155, 103 Am. St. Rep. 534.

In the case of Beidenkopf v. Insurance Co., supra, this court quoted with approval the language of the court in Bonaparte v. R. R. Co., supra, as follows:

" 'There is no power the exercise of which is more delicate, which requires a greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages.' So, also, in

Thompson v. City, 9 N. J. Eq. 624, in affirming the refusal of a temporary writ, it is said that 'in the bill, answer, and affidavits, no case of threatening irreparable mischief is made out. That is the only question he (the chancellor) had to decide upon the motion for a preliminary injunction, in advance of the hearing of the cause, and before the case was in a situation to be decided upon the merits. Where it does not appear that irreparable mischief is liable to ensue from leaving a party to go on exercising a right he claims, the court never stops him before it has an opportunity of examining the question of right.' * * * 'An injunction will not issue where the right of the complainant, which it is designed to protect, depends upon a disputed question of law about which there may be a doubt, which has not been settled by the * * * law of this state.' * * * Even where the technical right to injunctive relief is otherwise clearly established, it will be denied where the issuance of the writ may occasion inconvenience to the public and serious loss to the defendant, while the injury to the plaintiff can readily be compensated in damages. Becker v. R. R. Co., 188 Pa. 484, 41 A. 612; Fisk v. Hartford, 70 Conn. 720, 40 A. 906, 66 Am. St. Rep. 147. We have cited but few of the many precedents upon this question, but they establish we think the general trend of judicial opinion and indicate the conservative and safe rule to be observed in cases of this character. Applying that rule to the case made by the record before us, we hold that it shows no abuse of discretion by the trial court justifying us in reversing its ruling and requiring it to sustain the plaintiff's demand for a temporary injunction."

In the case of Ft. Dodge v. Ft. Dodge Telephone Co., 172 Iowa 638, on page 641, 154 N. W. 914, we said:

"The effect of such temporary writ, if continued, would have been to work an irreparable injury to the defendant before it could reach a hearing on the merits of the controversy. In determining whether a temporary writ of injunction shall issue, or whether it shall stand after issue, the court will look to the situation of both parties, the defendant as well as the plaintiff, and will exercise its power to issue or to dissolve with a view to the relative amount of injury to be suffered by the parties, respectively. When a temporary injunction will cause great injury to a defendant and be of comparatively little benefit to the plaintiff, it is a proper exercise of judicial discretion to refuse the writ. That a large discretion is vested

in the trial court in such matters we have often held. [Cases cited.] In the case before us, we think that the conditions upon which the dissolution of the writ was ordered afforded full protection to the plaintiff. The maintenance of the temporary writ could afford to the plaintiff no greater protection than it now has so far as preserving the fruits of the litigation is concerned. If the writ could work any further advantage to the plaintiff, it would be only the indirect advantage of inflicting irreparable injury upon the defendant pending litigation. This is only saying that the use of the writ to such end would be oppressive, and furnishes a reason for its dissolution rather than its maintenance."

The case of Finch v. Warrior Cement Corporation, 16 Del. Ch. 44, 141 A. 54, 60, is very similar in its facts to the case at bar. In that case the court said:

"But a refusal to grant the relief of cancellation does not mean that the complainants as stockholders are to be deprived of any relief whatever. The alternative prayer of their amended bill is that, in event cancellation is not decreed, they be awarded a decree for damages and a lien. That they are entitled to a decree for damages in an amount representing the value of their stock based upon its proportionate share of the total net assets of the company is a form of relief to which they are entitled."

In the case of Tanner v. Lindell Ry. Co., 180 Mo. 1, 79 S. W. 155, loc. cit. 161, 103 Am. St. Rep. 534, the court said:

"It is not necessary, in order to redress the plaintiffs' wrongs, that any such remedy be applied. They are entitled to recover, in a proper proceeding, the value of their stock at the time of its conversion, if they elect to consider it a conversion, or they are entitled, if they so prefer, to have the same proportion of United Railways stock given to them in exchange for their Lindell stock that was given to the individual defendants in exchange for theirs, or, if they prefer to hold their Lindell stock, they may have their proportion of the earnings of the Lindell property in the hands of the United Railways Company or the transit company; but they are not entitled to pull down the whole new structure that has been built upon the properties that have been transferred to the United Railways Company under the circumstances stated in the petition."

The facts in this case are extraordinary, and under them far greater harm and damage may be incurred by the defendants than can be possibly done to the plaintiff if the injunction were allowed to stand. It appears in this case that the stockholders representing more than 99½ per cent of all of the stock issued have consented to the proposed reorganization plan. A stockholder representing less than one-half of one per cent of the stock issued is making objections to the reorganization.

The par value of the issued stock is $5,250,000. The par value of plaintiff's stock is only $10,000. In our opinion, the interest of the plaintiff in this case can be fully protected by requiring defendants to deposit the amount of cash for nonassenting stockholders as proposed in the reorganization plan, and in addition thereto execute a bond conditioned on the payment to the plaintiff and other objecting stockholders, if any, of their pro rata share of the value of all the assets of the West Virginia corporation, including any and all amounts realized, if any, upon the claim which plaintiff urges in favor of the West Virginia corporation against the estate of its former president. This bond can be furnished in addition to the cash proposed to be deposited by the West Virginia or Iowa corporation, in the depository for nonassenting stockholders. Under the record, it appears that, if the entire claim which plaintiff urges on behalf of the West Virginia corporation is allowed against the former president, the proportionate share of plaintiff's interest in the proceeds thereof would be about $10,000.

The reasonable value of plaintiff's stock has not been shown. It may be more or less than the amount proposed to be deposited for him, assuming that the West Virginia corporation has a legal right to sell all of its property. The plaintiff in such event is entitled to receive the actual value of his interest therein, and cannot be compelled to accept any arbitrary amount fixed by the board of directors. While plaintiff cannot be compelled to accept such an arbitrary amount, neither should he be allowed to prevent the sale of all of the assets and property of the West Virginia corporation to the new Iowa corporation in exchange for stock therein. This should not be prevented under both the West Virginia and Iowa laws, if adequate protection is afforded plaintiff in some other manner.

In view of the fact that the stock represented by plaintiff and all other nonassenting stockholders is less than one-half of one per

cent of the entire stock issued, and that the interest of the plaintiff can be adequately protected in some other manner, we believe this is a case for the application of the "Balance of Convenience Rule." In this case the giving of such protection has been suggested by defendants in both their written and oral arguments.

It is our conclusion that the rights of the plaintiff can be fully protected in the following manner: (1) by depositing the cash as proposed, and (2) by filing an indemnity bond in the sum of $10,000 securing plaintiff from any loss he might sustain by the proposed transfer as alleged.

It is therefore hereby ordered that, if the cash is so deposited, and such a bond is filed within thirty days after the filing of this opinion, then the injunction allowed by the lower court shall be dissolved and the case will stand reversed, with this modification. It is further ordered that on the filing of such a bond within thirty days from the filing of this opinion the temporary injunction shall be dissolved; if the bond indicated is not filed within that time, the order of the lower court shall stand affirmed. Costs are taxed to the defendants.—Reversed on condition.

ALBERT, C. J., and ANDERSON, KINDIG, MITCHELL, and STEVENS, JJ., concur.