ADOLPH T. BERGER et al., appellants and appellees, v. AMANA SOCIETY et al., appellees and appellants.

No. 49571.

(Reported in 95 N.W.2d 909)

April 8, 1959.

Rehearing Denied July 24, 1959.

Swift & Swift, of Marengo, Edward J. Von Hoene, of Williamsburg, and Messer, Hamilton & Cahill, of Iowa City, for appellants and appellees.

Bleakley & Terpstra, of Cedar Rapids, and F. Paul Harned, of Marengo, for appellees and appellants.

THOMPSON, C. J.—Prior to 1932 the Amana Society had been organized as a corporation not for pecuniary profit under the laws of Iowa. It was in essence a communal association, with religion and religious observances as its basic motive. All property was held jointly; that is, as community property.

In 1932 it was determined that it was advisable to reorganize upon more modern lines. At that time a corporation for pecuniary profit was formed under the name of Amana Society. It took over all the properties of the former association, apparently with the consent of all members. The incorporation followed a Plan of Reorganization to which all adult members of the former Society agreed.

The 1932 Articles of Incorporation provided for capital stock in the amount of $2,060,000, divided into 32,000 Prior Distributive shares of the par value of $50 each, 4000 shares of Preferred stock of the par value of $50 each, 1200 shares of Class A Common stock of the par value of $50 each, and 4000 shares of Class B Participating stock of the same par value. No shares of the Preferred or Class B stocks were ever issued.

The affairs of the corporation proceeded harmoniously through the twenty years of its allotted life. In 1952 it became necessary to renew the corporate charter. This was done, with the assent of all holders of stock, including Class A around whom the present controversy has developed. A preamble to the 1952 charter recites that it is considered desirable to "extend, continue and perpetuate the traditions, customs, religious beliefs and community life at the Villages of Amana * * * by extending * * * the corporate life for an additional period of twenty years and effecting only such changes in the Articles of Incorporation * * * as may be necessary or desirable to meet gradually changing economic conditions and protect and promote the welfare of the members of the corporation who are also the owners and holders of its Class A Common stock; * * *."

The 1952 Articles of Incorporation, which we shall hereinafter refer to as the charter, provide in Article III that a part of the general nature of the business of the corporation and of its objects or purposes shall be: "To perpetuate and meet the obligations contained in a Plan of Reorganization of the original Amana Society which was entered into as an agreement and signed by all of the members of the old Amana Society in February, 1932, as such plan has since been modified or may be modified hereby."

The provisions for capital stock contained in the charter were somewhat, but not greatly, different from those of the 1932 Articles. There was authorized a total of $1,350,000, of which 21,000 were Prior Distributive shares; 4000 were Preferred shares; and 2000 were Class A Common stock. All shares had a par value of $50 each. The plaintiffs in the instant case, holders of Class A stock, signed the stock register and consented to the provisions of the charter and the conditions under which their stock was issued.

The trouble with which we are confronted here arises from amendments to the charter adopted in 1955. Article XVI of the charter provides that amendments, excepting to Article XIV (the Article exempting private property of the stockholders from liability for the corporate debts), may be made at any annual or special meeting of the stockholders on vote of two thirds of all Class A stockholders. It is also provided that

amendments may be made by vote of two thirds of all Class A stockholders present at a regular or special meeting when a written notice of the substance of the proposed amendment has been mailed to each Class A stockholder not less than sixty or more than ninety days prior to the date of the meeting. The 1955 amendments were adopted by the latter procedure, by a vote of more than two thirds of the Class A stockholders attending the meeting, although it was somewhat less than a two-thirds majority of all such stockholders. However, it is not seriously contended that the procedure was defective.

The amendments made radical changes in the stock structure of the corporation. The chief alteration is the provision for issuance of 300,000 shares of Class B common stock with a par value of fifty cents per share. The Class A stock is changed to 100,000 shares of the par value of fifty cents per share, and each share of such stock issued and outstanding at the time of the adoption of the amendments is reclassified and changed into 100 shares of the par value of fifty cents each. The Class B stock will now have equal voting rights with Class A, and equal rights to dividends and distribution of assets.

The charter of 1952, prior to amendment, provided that when a holder of Class A stock desired to sell, or, in the event of his death or removal from the limits of the corporate property, his share must be offered to the corporation, which "shall purchase and pay for the same at the true value thereof within 30 days from the date the stock is so tendered." No person could hold more than one share of this stock. The Plan of Reorganization, to which reference is made, contemplated that Class A stock should be issued only to members of the former Society, or to their heirs. The amendments of 1955 make a radical change in the manner of payment for shares of this stock when tendered, or upon the death or removal of the holder. Instead of payment by the corporation at the true value of the stock, the holder is now to receive an equal number of shares of Class B stock, provided for by the amendment in the number of 300,000 shares at a par value of fifty cents per share.

There were outstanding at the time of the commencement of this litigation 652 shares of Class A stock, and under the provisions of the amendments there would be issued 100 shares

of Class A stock to each holder of one share, making a total of 65,200 shares. As against this there are authorized 300,000 shares of Class B. It is evident that the Class A shareholders, who have heretofore had the sole voting rights, may now be outvoted by a large majority, nearly 5 to 1. It is also evident that, since the Class B stock will share equally in dividends and distributive rights, the value of the Class A stock has been very materially reduced. We have stated the facts as shown by the pleadings and attached exhibits.

I. The case comes to us in the way of two appeals from orders of the trial court upon the applications of the defendants, Amana Society and its codefendants officers and directors, for determination of law points under R. C. P. 105, with leave to appeal from adverse rulings granted to both plaintiffs and defendants. The matters complained of by the plaintiffs may be classified as substantial; that is, going to the merits of the case; while the rulings adverse to the defendants were procedural. We shall first consider the plaintiffs' appeal.

It is the contention of the plaintiffs, holders of Class A stock, that the relation between them and the corporation is contractual, and that the amendments of 1955 violate the terms of their contract. They bring their action for themselves and all other holders of Class A stock. The plaintiffs themselves hold only 10 or 12 shares (there is some dispute in the arguments as to the exact amount, but it is in any event less than two per cent of the outstanding Class A stock). However, as we view the case, the amount of their holdings is not material.

In substance, the plaintiffs contend that they have rights under a contract with the corporation; the defendants claim that they have no contract, or that if they have a contract it is not the contract which plaintiffs assert, and that they have waived any rights under a contract or are estopped to assert them, if a contract they have. The point at issue comes down to the question as to what the exact contract is, under rules of law applicable. Since no evidence has been taken, we are bound to consider the well-pleaded allegations of the petition and the answers.

There can be no doubt that the relation between a corporation and its stockholders is contractual. Bishop v. Middle

States Utilities Co., 225 Iowa 941, 947, 282 N.W. 305; Ontjes v. Bagley, 217 Iowa 1200, 1209, 250 N.W. 17. But it is equally true that the statutes of the state governing corporations and their organization are also a part of the contract. And all of the provisions of the charter are likewise to be considered in determining the true agreement. We here reach the real question to be decided. The Class A stockholders without doubt had a contract with the Amana Society. But all of the provisions of the charter and of the corporation laws of Iowa, so far as material, are a part of the contract. The plaintiffs contend that their agreement is that the value of their stock may not be impaired or diluted by the issuance of other stock of equal rights and values as to voting, dividends and distribution, and that they cannot be deprived of their right to have their stock purchased by the Society at its true value or compelled to take other stock in lieu of cash therefor. The defendants say that the corporation laws and the provisions of the charter of 1952, to which plaintiffs assented, give them the right to amend as they have done by the amendments of 1955. In fact the question is, not do plaintiffs have a contract, but what is the contract?

II. We turn first to the charter of 1952 itself. As a part of Article V it is provided: "The capital stock of this corporation, or any class thereof, may be increased or decreased from time to time by amendment to these Articles without the consent or vote of any individual stockholder * * *." Article XVI authorizes "Amendments to these Articles, excepting Article XIV" (relating to exemption of property of stockholders from corporate debts), under procedures not necessary to detail here, since no serious claim is made that they were not followed in adopting the 1955 amendments.

All sections of the Code of Iowa hereinafter referred to were in effect at the time of the adoption of the 1952 charter of the Amana Society. Section 491.5 says among other things that the Articles of Incorporation of all corporations shall contain the amount of capital stock, the classes of stock and number of shares authorized, with the par value and conditions of each class of such shares, see paragraph 3. Paragraph 7 of the same section requires the articles to state the manner in which they may be amended.

It is the defendants' contention that, if plaintiffs had a contract with the corporation, it was limited by the provisions for amendment in the corporate charter and by the general incorporation laws of Iowa. They point also to section 491.20, which is too lengthy to justify quotation in full here. It provides for amendments to charters and the methods by which they may be made; the opening sentence refers to "Amendments to articles of incorporation making changes in any of the provisions of the articles" and says they may be made by the method thereafter set out.

But the plaintiffs contend that fundamental changes in the corporate purposes or structure may not be made under a general reserved power of amendment without the unanimous consent of all stockholders. They cite 13 Am. Jur., Corporations, section 79, page 224; Richey v. Sovereign Camp, 184 Iowa 10, 168 N.W. 276, L. R. A. 1918F 1116; Fort v. Iowa Legion of Honor, 146 Iowa 183, 123 N.W. 224; Colgate v. United States Leather Co., 75 N. J. Eq. 229, 72 A. 126; Sutton v. Globe Knitting Works, 276 Mich. 200, 267 N.W. 815, 105 A. L. R. 1447; Garey v. St. Joe Mining Co., 32 Utah 497, 91 P. 369, 12 L. R. A., N. S., 554; Martin Orchard Co. v. Fruit Growers Canning Co., 203 Wis. 97, 233 N.W. 603; State ex rel. Cleary v. Hopkins Street Bldg. & Loan Assn., 217 Wis. 179, 190, 257 N.W. 684, 688, and other cases. The defendants rely upon Johnson v. Bradley Knitting Co., 228 Wis. 566, 280 N.W. 688, 117 A. L. R. 1276; Peters v. United States Mortgage Co., 13 Del. Ch. 11, 114 A. 598; Morris v. American Public Utilities Co., 14 Del. Ch. 136, 122 A. 696; General Investment Co. v. American Hide and Leather Co., 98 N. J. Eq. 326, 129 A. 244, 44 A. L. R. 60, and other authorities. The subject may be found and discussed in the annotations in 105 A. L. R., page 1452 et seq., subject "Power of corporation to change obligations to stockholders"; and in 117 A. L. R., annotations, page 1290 et seq., same subject.

The cases deal with differing statutes governing corporations and arrive at varying conclusions. Some of them cannot be reconciled. We think the true rule is thus expressed in 18 C. J. S., Corporations, section 496, page 1174:

1068

"A radical and fundamental change in the objects, purposes, or business of the corporation interferes with the contract rights of each stockholder with the corporation and cannot be made without the consent of all stockholders, except by virtue of some act of legislation which may be read into the contract of incorporation; * * *."

Our problem here is to determine whether the amendments attempted in 1955 are within the class permitted by the provisions of the charter or the corporation laws of Iowa. The able trial court dealt with the question in an exhaustive opinion, in the course of which it said: "It may be conceded that a fundamental and radical change in the purpose of a corporation cannot be accomplished by an act of the corporation over the dissent of a single stockholder." But the court then held that the power to amend was a part of the contract and so the pleadings showed no right of the plaintiffs to object to the amendments of 1955.

█ We agree that the state laws and the amendatory provisions of the charter are a part of the contract. Applying this principle to the situation before us as made by the pleadings, there is to be considered the general provision relating to amendments found in Article XVI of the charter, and of section 491.20, supra. These, standing alone, we think would not permit fundamental changes in the purposes and structure of the corporation; and that the amendments of 1955 create such changes is not open to serious question. 13 Am. Jur., Corporations, section 79, page 224, supra; McKenzie v. Guaranteed Bond & Mortgage Co., 168 Ga. 145, 147 S.E. 102. We think the real issue is the intent of the parties in making the contract which the plaintiffs hold with the corporation. Was it contemplated at the time the stock was issued that amendments might be made which would authorize the issuance of additional or other classes of stock, and that such issue would materially depreciate the value of the stock presently being issued and take away the contract rights which the stockholders would otherwise have?

Here we come to Article V of the charter, from which we have quoted above the language permitting amendments which would increase or decrease the capital stock of the corporation

or any class thereof; and the same section, immediately following the quoted words, denies to any stockholder "any preemptive or preferential rights of subscription for * * *. any class of stock of this corporation now in existence *or hereafter to be created or provided for, whether now or hereafter authorized or issued.*" (Italics supplied.) This seems clearly to contemplate not only changes in the amounts of existing stock, but the possibility that, by amendment, other classes might be authorized. It is a part of the contract upon which plaintiffs rely. We are constrained to hold that the trial court was correct in ruling that plaintiffs have no valid cause of complaint because of the amendments so far as they authorize the issuance of Class B stock. So it must follow, that if their contract permits amendments of the charter which authorize increases or decreases in the stock then in existence or the issue of new classes, they cannot object if such changes affect their voting rights or attributes of stockholding which would necessarily follow changes in the already authorized stock or the addition of other classes. Morris v. American Public Utilities Co., supra, 14 Del. Ch. 136, 122 A. 696.

III. But there are other rights involved than control of the corporation. We have referred to the provisions that Class A stockholders, when they desire to surrender their stock, or upon the death of a holder or his removal from the territory of the corporation, must be paid the true value of their shares by the corporation. In other words, the corporation has contracted to redeem the stock at an agreed valuation. The amendments of 1955 take away this right, leaving the plaintiffs only the opportunity to exchange for Class B stock; and upon death or removal the acceptance of Class B stock is mandatory upon them or their legal representatives. Likewise, the value of their stock will be seriously depreciated by the issuance of the authorized Class B shares. These are to have a par value of fifty cents per share; and so, assuming they are sold at that figure, as the corporation has the right to do under the amendments, the Class B stock would not only gain control of the company, but would have equal rights to dividends and distribution with the Class A stock; in fact, greater rights because there would be more of it.

We cannot think that it was fairly within the intent of the parties at the time of the adoption of the present charter and the issuance of the Class A stock that the holdings of the holders of this class could be so greatly diluted and depreciated. Common sense would seem to indicate that those who accepted the Class A stock expected it would be redeemed by the corporation at its actual value, rather than in terms of some then unauthorized stock of unknown worth. The change at this point is such a radical one and so greatly affects the rights of the Class A stockholders that it requires something more than a general reserved right of amendment of the Articles or the right to issue additional classes of stock to make it effective against non-assenting Class A stockholders. See McKenzie v. Guaranteed Bond & Mortgage Co., supra.

It is our conclusion that the amendments of 1955 went beyond the power of the corporation to alter its contract with the objecting stockholders in the respects set forth above in this division. While the right to issue additional stock of the existing classes or to authorize and issue stock of new classes would impliedly carry with it the right to permit these additional stocks to share in dividends and distribution, even to the detriment of the present holders of shares, the right of redemption at actual value, undiminished by the demands of the new stock, could be taken away only by something more explicit, more in the nature of an express contract, than we find present here. The court was in error in holding that these rights of redemption were lost to the plaintiffs or that they were compelled to accept payment in Class B stock or to accept 100 shares of the new Class A stock for each share they now hold.

IV. The Class A stockholders may also have certain rights to medical and hospital care and other matters which in certain circles might be referred to as "fringe benefits", under the terms of the Plan of Reorganization. The trial court did not pass upon the question of the retention of these rights, although it expressed the opinion they are fundamental. We likewise do not decide this question, although the analogy of this question and to the one discussed in Division III above seems obvious. Much of the discussions and holdings in Richey v. Sovereign

Camp and Fort v. Iowa Legion of Honor, both supra, seem quite applicable here and to Division III.

V. It remains to determine the questions raised by defendants' appeal. The first ruling of the court upon the application for adjudication of law points to which the defendants object is its holding that the averments of Paragraph 9 of plaintiffs' petition are material and relevant and not redundant. These allegations, summarized, are: That the corporate stock is not traded on the open market and its true value can be ascertained only by appraisal of the assets of the corporation; the defendant directors control the books and records and arbitrarily fix the value on the books, which as so fixed is much less than the true value. The corporation owns 25,000 acres of good farm land, large numbers of livestock, woolen mills, cabinet factory, stores, lumberyard, feed mill, a machine shop, bakery, print shop and other business enterprises. On and prior to December 12, 1955, the book value of the Class A Common stock was represented by the directors to be approximately $3700 per share, but its true value was in excess of $10,000 per share.

The trial court reserved any rulings upon the issues of fraud, bad faith and fiduciary relationships, for the reason that these are matters of evidence. The matters set out in Paragraph 9 of the petition it thought material upon these issues, and we agree.

Next, the defendants contend that the court was in error in holding that plaintiffs' action for injunction will lie. They urge that quo warranto is the only proper remedy. Quo warranto is available only where the public interest is involved and does not lie to adjust strictly private rights or wrongs. State ex rel. Robbins v. Shellsburg Grain & Lumber Co., 243 Iowa 734, 737, 53 N.W.2d 143, 144, and cases cited. Plaintiffs' action is not brought to conserve or protect the public interest, but to redress a claimed private wrong. The trial court ruled correctly at this point.

Finally, the defendants say that plaintiffs are collaterally attacking an act of the Secretary of State, who approved the amendments of 1955 when they were presented to him for filing; and that the trial court was in error in holding that the division of defendants' answer which set up this defense did not

in fact constitute a defense to plaintiffs' cause of action. They say certiorari was the proper remedy. It is sufficient answer to this contention to say that it is no part of the duty of the Secretary of State to concern himself with the conflicting rights of stockholders, at least those which do not appear upon the face of the Articles. His duties are defined by section 491.6 of the Code of Iowa. He must satisfy himself that the Articles are in proper form, that their object is a lawful one and not against public policy, and that the plan for doing business is honest and lawful. If the Articles or amendments meet these requirements, it is his duty to file them.

But he does not pass upon such matters as are involved in the present action. Presumably he has no knowledge of many of the points raised here. Defendants' position, if sustained, would make the Secretary the arbiter of controversies even before they were presented to him. It is without merit.

VI. Separate answers were filed by the directors of the corporation and by the Secretary, but they raise issues identical with those found in the answer of the defendant Amana Society. All defendants made common cause, and our holdings apply equally to each of them.

By way of summary, it is our holding that the defendant corporation may issue additional stock; but that it may not, in so doing, impair the contract rights of the nonassenting stockholders to redemption of their present shares at their true value undiluted by the new issues.—Affirmed in part and reversed in part upon plaintiffs' appeal; affirmed on defendants' appeal, and remanded for further proceedings in accord with this opinion.

All JUSTICES concur.